**John PAASCH, Plaintiff,**

v.

**CITY OF SAFETY HARBOR, Defendant.**

**No. 93–1717–CIV–T–25(B).**

United States District Court,
M.D. Florida,
Tampa Division.

April 26, 1995.

---

John Kermitt Finch, Law Office of Donald R. Peyton, Safety Harbor, FL, for plaintiff.

Alan S. Zimmet, Stephanie Vaughan Wilde, Tew, Zinober, Barnes, Zimmet & Unice, Clearwater, FL, for defendant.

## ORDER

THOMAS G. WILSON, United States Magistrate Judge.

This suit arises under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.* The plaintiff John Paasch contends that he needed leave to treat a serious health condition and that his employer, the defendant City of Safety Harbor, violated the Act in its response to his needs. The defendant, relying primarily on the plaintiff's resignation, asserts that there was no violation of the Act. Both sides have, in effect, filed motions for summary judgment. Consideration of the parties' submissions, as illuminated by the arguments of counsel, reveals that the defendant's motion should be granted.

## I.

The plaintiff began work as the Building Official for the City of Safety Harbor in October 1984 (Doc. 1, Ex. D). That employment continued into 1993, but was purportedly affected in 1991 when Pamela Brangaccio was appointed City Manager. In February 1993, the plaintiff related to a psychiatrist, Dr. Walter E. Afield, that City Manager Brangaccio and her staff had severely harassed him for two years to the point that he was becoming dysfunctional (Doc. 14, Ex. A). The plaintiff, nevertheless, continued to work into July 1993, apparently without bringing this matter to the attention of the City.[1]

The plaintiff, on July 5, 1993, began a two-week vacation (Doc. 52, Ex. A). He did not return to work on July 19, as scheduled (*id.*). Rather, a letter dated July 16, 1993, was delivered to the City from Dr. Afield stating (Doc. 1, Ex. B):

> Please excuse John Paasch from his job until I have had the opportunity to evaluate him further. He is scheduled for an appointment in my office on Tuesday, July 20, 1993, at 2:00 PM.

When the City had heard nothing further from the plaintiff by August 3, Brangaccio wrote to him, requesting that by August 9 he provide "further documentation regarding [his] current medical condition and [his] expected return to work date" (Doc. 1, Ex. G). While the plaintiff did not provide the requested information by August 9, his attorney on that date met with the City's Personnel Officer. In an uncontroverted affidavit, that official stated that she learned from plaintiff's attorney that the plaintiff "unequivocally would not be returning to work, but would be resigning" (Doc. 52, Ex. B). At counsel's request, she forwarded him a short-

---

1. Attached to the complaint is a statement, dated June 9, 1993, from Dr. Beltran J. Pages, a psychiatrist, indicating that the plaintiff was under severe stress and needed leave from June 10 through June 17 (Doc. 1, Ex. A). The City says that it never received this statement (Doc. 52, Ex. A, p. 2). This is supported by the fact that the record contains no evidence that leave was ever requested for that period.

term disability form to send to Great–West Life and Annuity Insurance Company (*id.*).

On August 10, the City sent a letter to the plaintiff advising him that, if he did not provide by August 17 the documentation and information requested in the August 3rd letter, the City might take disciplinary action, up to termination of employment (Doc. 1, Ex. H). The following day his attorney hand-delivered a responsive letter to Brangaccio (Doc. 52, Ex. 1–A). That letter stated in part (*id.*):

> Enclosed please find copies of the medical reports from Dr. Walter Afield. As I am sure you can see from these reports, Mr. Paasch is disabled and unable to continue in his position at present.
>
> It is my sincere hope that you can empathize with Mr. Paasch's present condition and render all assistance necessary to a smooth and rapid determination of disability for Mr. Paasch....
>
> .     .     .     .     .
>
> Please provide what assistance you can in resolving whether Mr. Paasch's disability will be covered through workers' compensation or the Great–West Insurance Company....

The enclosed reports from Dr. Afield indicated that the plaintiff was mentally unable to cope with alleged harassment by Brangaccio. Thus, the reports contained the following comments (Doc. 52, Ex. 1–B):

> 1. *February 17, 1993* (a comprehensive report which contained a diagnosis of severe depression).
>
>    [The plaintiff] is reporting severe harassment of two years duration from his superior, the City Manager and her staff.... He feels that this has resulted in complete alienation from all co-workers.... The more he continues to be harassed, the more "I am becoming dysfunctional, unable to concentrate, fearing any decision I make will be the wrong one." ... No matter what program or decisions he has presented, the City Manager and her staff say he is wrong.... He is afraid to do his job and is on guard continuously....
>
> 2. *March 1, 1993.*

> The man is rather depressed and he is, I think, rather clearly impaired. He is having a great deal of difficulty with his female supervisor. Clearly, there is harassment going on. It is causing serious emotional problems. If it does not stop he will probably wind up being forced into a disability posture.
>
> 3. *March 31, 1993.*
>
>    He seems to be functioning a lot better but he still is very stressed by this apparently very sick female boss that he has. They are being quite irrational and making unnecessary attacks on him.... He seems to have his depression lifted some but I am sure it will be back as these people continue to harrass [sic] and try to drive him out of his work.... Hopefully, we will not have to hospitalize him because he gets depressed because of this severe harassment.
>
> 4. *July 20, 1993.*
>
>    Mr. Paasch has come in and is profoundly depressed.... The man is petrified of returning to work. He has an absolute phobia about it. He is agitated and depressed and quite upset. He is particularly upset about his supervisor, a woman, who has been harassing him rather seriously.... At this point I think he is actively and profoundly depressed and suicidal. I think ... we are going to hospitalize him at St. Joseph's Hospital.
>
> 5. *August 1, 1993.*
>
>    Unfortunately, we were unable to hospitalize Mr. Paasch [because] Great Western Insurance refused payment and he cannot afford it on his own. I have suggested he go in to the Crisis Center but he is fearful of doing something like that.... We can try to work with the man on an outpatient basis, he does not appear actively suicidal at this point, but I think, we are taking a chance. He is absolutely petrified about returning to the work situation[,] is phobic about it and will not do so.

After receiving these materials, Brangaccio "decided to terminate Mr. Paasch from employment with the City because, based upon Mr. Paasch's doctors' opinions, as contained in the medical records provided by the Plain-

tiff's attorney, and the City's conversations with representatives of the Plaintiff's attorney, it was clear to [her] that Mr. Paasch would never return to work for the City" (Doc. 52, Ex. A). Consequently, on August 23, the attorney for the City wrote to plaintiff's counsel that the City Manager had reached a conclusion that the plaintiff's employment should be terminated, although she was willing to offer him the opportunity to resign instead (Doc. 14, Ex. G). The letter pointed out that, if the plaintiff resigned, he would receive $6,723.51 for unused sick leave, personal leave, and vacation leave, but that, if he was terminated, he would not be entitled to payment for unused sick leave or personal leave, and would thus only receive $2,953.88 for vacation leave (*id.*). The letter also mentioned various disability benefits to which the plaintiff might be entitled.

The plaintiff, in the meantime, had submitted a claim for workers' compensation. That claim was denied by the insurance carrier on August 23, 1993 (Doc. 1, Ex. E).

On August 24, the City's attorney had a telephone conversation with the plaintiff's attorney about the City's offer on the previous day to let the plaintiff resign, rather than face termination (*see* Doc. 29, Ex. E). The plaintiff's counsel informed the City's attorney that the plaintiff "was willing to resign from his position as Building Official for the City of Safety Harbor, but wished some assurances that a resignation would not affect his claim for disability benefits" (*id.*). The letter memorializing the telephone call stated further that the City's long-term disability insurance carrier had advised that, if the plaintiff's disability occurred while he was employed by the City, he may be entitled to long-term disability benefits (*id.*). The letter concluded with a request that the resignation be submitted by 5:00 p.m. on August 30 (*id.*).

The plaintiff, however, apparently had a change of mind, as a resignation was not submitted by August 30. Consequently, on September 1, Brangaccio sent the plaintiff a letter scheduling a disciplinary hearing for the next day at 4:30 p.m. (Doc. 29, Ex. F). The letter stated (*id.*):

> It appears from the information provided to the City, that you are currently unable

to perform the essential functions of your position and that your expected date of return is unknown at this time. The City has strived to work with you during the past seven weeks but now must move forward with regards to conducting the operations of the Building Department. Therefore, unless additional information is brought forth at the pre-disciplinary hearing, your employment with the City will be terminated as of 5:00 p.m. on September 2, 1993.

Prior to the hearing, the plaintiff's lawyer had a letter delivered to Brangaccio advising that the plaintiff would not appear at the hearing due to his mental condition (Doc. 29, Ex. H). This letter was accompanied by a statement from Dr. Beltran J. Pages, a psychiatrist, that the plaintiff was "extremely anxious, depressed, . . . is petrified of going by City Hall," and "is demonstrating symptoms of phobia" (Doc. 29, Ex. G). The attorney's letter asked if the City would therefore assist the plaintiff in receiving inpatient care through the City's health insurer (Doc. 29, Ex. H). The letter concluded (*id.*):

> Mr. Paasch requests and looks forward to the full cooperation of the City in the continuation of his available sick leave. Be advised that Mr. Paasch has no intention of resigning his position with the City.

Consistent with the letter, the plaintiff did not appear at the hearing, although his attorney did (Doc. 52, Ex. A). According to Brangaccio's uncontroverted affidavit, the plaintiff's counsel "never challenged the proposed termination, claimed that the Plaintiff would be able to return to work for the City nor presented medical documentation to show that the Plaintiff would be able to return to work for the City" (*id.* at p. 3). The attorney did ask, however, that the date for the plaintiff's termination be extended until after the Labor Day weekend. Brangaccio granted that request and changed the date of termination to September 7.

The plaintiff, however, on September 7 submitted a letter of resignation to Brangaccio. That letter stated (Doc. 29, Ex. I):

> It is my understanding that if I do not resign today, my employment with the

City of Safety Harbor will be terminated due to an illness, not in my control, that prevents me from performing my duties at this time.

If terminated, I would stand to lose a sizeable quantity of benefits which I can ill afford. Those benefits are as enumerated, but tabulated incorrectly, in your prior letter to me.

Under duress, I hereby resign my position as Building Official for the City of Safety Harbor, effective 9:00 a.m., September 7, 1993.

As a result, the next day the plaintiff was sent a check for his vacation leave, sick leave, and personal leave (Doc. 52, Ex. 2–B). The plaintiff thereafter cashed the check (*id.*).

The following month, the plaintiff filed this suit alleging a violation of the Family and Medical Leave Act of 1993 (Doc. 1). Nevertheless, the plaintiff on November 3, 1993, submitted a claim for long-term disability benefits to Great–West Insurance, thereby indicating that he would be unable to ever return to work for the City (Doc. 52, Ex. 2–B). The disability claim was subsequently denied.

The City responded to the plaintiff's lawsuit by filing a motion to dismiss (Doc. 4). That motion was then converted to a motion for judgment on the pleadings (Doc. 7), and later to a motion for summary judgment (Doc. 55). The plaintiff has also filed a motion for summary judgment (Doc. 29).

The parties thereafter consented to proceed before a United States Magistrate Judge (Doc. 35), and, as a result, an order of referral was entered (Doc. 36). After the plaintiff had been afforded an opportunity to supplement his response (Doc. 55), a hearing was held on the motions for summary judgment.

## II.

The plaintiff's sole claim is based upon the Family and Medical Leave Act, which did not become effective until August 5, 1993. 29

C.F.R. 825.102(a). As pertinent here, the Act entitles an eligible employee to 12 workweeks of leave during any 12–month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee".[2] 29 U.S.C. § 2612(a)(1)(D). The law also entitles the employee, upon completion of the leave, to be restored to the position of employment that was held when the leave commenced, or to its equivalent. 29 U.S.C. § 2614(a). The Act further makes it unlawful for any employer to interfere with, restrain, or deny the exercise of these rights. 29 U.S.C. § 2615. Moreover, it authorizes employees to bring civil actions to recover certain damages, or to obtain equitable relief. 29 U.S.C. § 2617(a).

The motions for summary judgment in this case are, of course, governed by the same well-established standards that apply to other litigation. The court shall enter summary judgment only if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are those over which disputes "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Disputes about material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The movant bears the burden of establishing the absence of dispute over material facts. *Reynolds v. Bridgestone/Firestone, Inc.,* 989 F.2d 465, 469 (11th Cir.1993).

In determining whether the moving party should be awarded summary judgment, the court must view the evidence and factual inferences therefrom in the light most favorable to the opposing party. *Id.* Any reasonable doubts about the facts are to be resolved

---

2. The defendant has filed an affidavit of a psychologist, Dr. James R. Flens, opining that the plaintiff does not have a serious health condition as defined in the Act (Doc. 52, Ex. C). This raises a factual dispute that is sufficient to defeat the plaintiff's motion for summary judgment. In connection with the defendant's motion, however, it will be assumed that the plaintiff has a serious health condition within the meaning of the Act.

in favor of the party opposing the motion for summary judgment. *Id.*

### III.

█ It is evident that the plaintiff's claim under the Family and Medical Leave Act was an afterthought. The plaintiff, although represented by counsel, never once mentioned the Act during the various communications with the City's attorney or its employees. While an employee need not expressly refer to the Act in order to obtain its benefits, 29 C.F.R. 825.302(c), it would certainly seem that an attorney would at least advert to the Act if he was asserting for his client a claim to its rights.

In this case, the plaintiff, at least up through August 1993, was not attempting to obtain leave so that he could return to work. Rather, he was trying to gain disability benefits based upon a mental incapacity to work. Moreover, that incapacity purportedly arose from his supervisor's conduct. The plaintiff had no reason to think that his supervisor's attitude and behavior would change if he took leave for a few more weeks. Significantly, in this respect, the plaintiff had been on leave since July 5, 1993, and, as of September 2, 1993, he was so "petrified" he could not even enter his office building with his lawyer to attend a hearing. Under these circumstances, it is understandable that the plaintiff was simply intent on receiving disability benefits so that he would not have to return to work and thus come under the supervision of the woman he perceived to be harassing him.[3]

The plaintiff's desire to obtain disability benefits, rather than medical leave, underlies the lack of merit in his contentions that, between August 23 and September 1, the defendant violated the Act on three occasions. The plaintiff, in this regard, asserts that the City violated the Act by sending (1) a letter on August 23 stating that the City Manager had concluded that the plaintiff should be terminated, (2) a letter on August 27 requesting the plaintiff's resignation by August 30, and (3) a letter on September 1 scheduling the pre-disciplinary hearing (Doc. 29, pp. 2–4).

█ Prior to September 2, the plaintiff never requested extended leave for medical reasons. The only request before September 2 was the July 16 note from Dr. Afield asking that the plaintiff be excused from work until he was examined by the psychiatrist on July 20. This excuse cannot fairly be read as a request for extended medical leave under the Act. Moreover, the Act did not even become effective until approximately two weeks after the date of the examination. And outside of Dr. Afield's note of July 16, the record contains no indication of any request for leave until September 2.

The plaintiff, furthermore, could not plausibly contend that, because he never returned to work, he was not required to make a request for leave. Although the regulations provide that no further notice is required if the employee was on employer-approved leave at the time the Act became effective, 29 C.F.R. 825.103(b), that is not the situation here. The employer plainly had not approved leave for the plaintiff for a period encompassing August 5, the Act's effective date.

In sum, the plaintiff, who was represented by counsel, never requested medical leave prior to September 2. Consequently, there is no basis for concluding that the City interfered with the plaintiff's rights under the Act before that date. Any other result would mean that the Act would constitute a trap for employers who fail to divine unspoken (and even unthought) requests for leave.

### IV.

█ On September 2, the plaintiff's counsel did send a letter, which, although not

---

3. In fairness to Brangaccio, it is appropriate to note that this record contains nothing to support the claim that she was harassing the plaintiff. While Dr. Afield was surprisingly judgmental about her, calling her, for example, a "very sick" woman, there is no reason to think that Dr. Afield has examined her, or even heard her side of the story. From all that appears, the plaintiff's complaints about Brangaccio could be a product of his mental impairment. In any event, there is no claim of sex discrimination in this case, and thus no need, or basis, for evaluating her conduct.

mentioning the Act, could be construed as a request for medical leave. Thus, after asking for assistance in obtaining disability benefits for the plaintiff, the attorney stated that the plaintiff "requests and looks forward to the full cooperation of the City in the continuation of his available sick leave" (Doc. 29, Ex. H).

The defendant argues, however, that any request for leave under the Act was terminated by the plaintiff's resignation on September 7. In this respect, the defendant points to the regulation that provides that, "[i]f an employee gives unequivocal notice of intent not to return to work, the employer's obligations under [the Act] . . . to restore the employee cease." 29 C.F.R. 825.309(b). The defendant contends that the plaintiff's resignation constituted "unequivocal notice of intent not to return to work."

The plaintiff responds that the plaintiff's resignation should be disregarded because it was not voluntary, but coerced.

■ Standards for determining whether an employee's resignation was voluntary were recently set out in *Venero v. City of Tampa, Fla.*, 830 F.Supp. 1457 (M.D.Fla. 1993), *aff'd,* 40 F.3d 389 (11th Cir.1994). In *Venero,* this court stated (830 F.Supp. at 1459):

> Employee resignations are presumed to be voluntary. Plaintiff must overcome this presumption by showing with sufficient evidence that the resignation was submitted under duress. The test for whether an employee was under duress to resign is that one side involuntarily accepted the terms of the other side, the circumstances permitted no other alternative, and the said circumstances were the result of coercive acts of the opposing side. *Christie v. United States,* 207 Ct.Cl. 333, 518 F.2d 584, 587 (Ct.Cl.1975). However, the court in *Christie* states that the voluntariness of resignations has been upheld where they are submitted for purposes of avoiding threatened termination for cause.

The plaintiff, therefore, cannot rebut the presumption that his resignation was voluntary simply by showing that he resigned because he was facing termination. As *Christie* and

other cases have stated, the plaintiff had the option to "stand pat and fight" his termination. *See, e.g., Alvarado v. Picur,* 859 F.2d 448, 453 (7th Cir.1988). Here, moreover, the plaintiff had the additional option to resign and seek disability benefits.

■ The plaintiff suggests that the larger leave pay-off upon resignation rendered the resignation involuntary. That suggestion, however, is unpersuasive. The plaintiff, as indicated, could have challenged his termination and attempted to remain on the payroll. The fact that, if his termination challenge were unsuccessful, he would receive a smaller payment, does not render his election to resign an involuntary act.

This court in *Venero* referred to four factors set out in *Stone v. University of Maryland Medical Sys. Corp.,* 855 F.2d 167, 174 (4th Cir.1988), for analyzing the voluntariness of a resignation: (1) Whether the employee was given some alternative; (2) whether he understood the nature of the choice he was given; (3) whether he was given a reasonable time in which to choose; and (4) whether he was permitted to select the effective date of his resignation. Here, the plaintiff had the alternative of either resigning (while retaining the opportunity to seek disability benefits), or of challenging his termination. The plaintiff clearly understood those options. Moreover, he was able to take several weeks to reach a decision. Finally, although the plaintiff was not fully permitted to select his resignation date, he was on September 2 given an additional grace period until September 7 to take action.

The circumstances here are appropriately compared with the facts in *Stone.* In that case, a doctor was told to resign or face termination and given only hours to decide his course of action. Nevertheless, the resignation was found, on a motion for summary judgment, to be voluntary. Since the pressures placed upon the employee in *Stone* were clearly more intense than those faced by the plaintiff, that decision strongly supports the conclusion that the plaintiff's resignation was voluntary.

Similarly, the time constraints faced by the police officer in *Venero* were greater than

those experienced by the plaintiff. Consequently, that decision, which has been affirmed by the court of appeals, shows that the plaintiff's decision was voluntary. *See also Parker v. Board of Regents of Tulsa Junior College,* 981 F.2d 1159 (10th Cir. 1992).

■ In short, the criteria generally used by courts to evaluate the voluntariness of an employee's resignation demonstrate that the plaintiff's attack on his resignation should be rejected. This case, in addition, contains a factor that destroys any semblance of merit in the plaintiff's challenge: The plaintiff was represented throughout by counsel. Particularly in light of the active role played by his attorney, the plaintiff cannot plausibly argue that he was denied the opportunity to make a free and informed choice. There certainly is nothing in the record to suggest that, despite the presence of counsel, the resignation was somehow rendered involuntary by the circumstances facing the plaintiff.[4]

■ The plaintiff also argues that his resignation was involuntary as a result of his mental illness (Doc. 14, pp. 13–14; Doc. 61, pp. 13–16). This argument, however, was not supported by a factual presentation, even though the plaintiff was expressly afforded an opportunity to submit such materials (Doc. 55). While the plaintiff apparently suffered from depression, and may have had a "phobia" about entering the building where he worked, those impairments would not ordinarily render the plaintiff incompetent to decide whether to resign.

Moreover, the defendant has made a strong showing that the plaintiff was mentally capable of making rational decisions. Thus, it submitted a portion of the deposition of the psychiatrist who saw the plaintiff on September 2, 1993, and that doctor indicated that, despite the plaintiff's depression, "his judgment and insight were good" (Doc. 52, Ex. D, p. 21). The plaintiff's family doctor similarly testified that he was not concerned about the plaintiff's ability to make rational

decisions (Doc. 52, Ex. H, p. 26). Further, two friends of the plaintiff stated in their depositions that they had no reason to think that the plaintiff was incapable of making sound, reasoned decisions (Doc. 52, Exs. F, G).

The plaintiff, as indicated, was given an opportunity to respond to the defendant's factual showing regarding his mental competence. However, although he iterated his argument, he presented no facts in support of it. Consequently, there is no factual dispute raised by the record concerning the plaintiff's ability to make rational decisions.

In sum, the plaintiff has wholly failed to rebut the presumption that his resignation was voluntary. But even apart from the presumption, the evidence in the record establishes without material dispute that the resignation was the result of a free and informed decision, which was arrived at with the assistance of counsel.

### V.

For these reasons, the defendant's motion for summary judgment should be granted, and the plaintiff's motion should be denied. Consequently, judgment, including costs, will be entered in favor of the City of Safety Harbor.

IT IS SO ORDERED.

DONE and ORDERED.

---

**4.** The plaintiff does not attempt to base any argument upon the language in the resignation letter stating that it was submitted "under duress." Nor could he successfully do so. A determination whether a resignation is voluntary is based upon objective factors under the totality of circumstances, and not upon an employee's subjective belief. *Stone v. University of Maryland Med. Sys., supra,* 855 F.2d at 174; *Christie v. United States, supra,* 518 F.2d at 587.