[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-14229

Non-Argument Calendar

_____

KYLE BLAKE,

Plaintiff-Appellant,

*versus*

CITY OF MONTGOMERY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:19-cv-00243-RAH-SMD

_____

Before JORDAN, BRANCH, and LUCK, Circuit Judges.

PER CURIAM:

Kyle Blake, formerly a firefighter employed by the City of Montgomery, appeals the district court's grant of summary judgment in favor of the City on his claims for interference and retaliation under the Family and Medical Leave Act. After careful review of the parties' briefs and the record, we affirm.

## I

### A

In 2012, the City of Montgomery hired Mr. Blake as a Montgomery firefighter. Two years later, Mr. Blake completed the training and certification required to serve the Montgomery Fire Department ("MFD") as both a firefighter and paramedic. In 2015, the MFD transferred Mr. Blake to a paramedic assignment.

Firefighters assigned to a paramedic position, like Mr. Blake, attend more calls than those assigned to fire suppression positions. In a typical month, for example, firefighters in fire suppression positions make between 14 and 38 runs, while firefighters on paramedic assignment make between 350 to 400 runs. In 2016, Mr. Blake requested a transfer from his paramedic assignment to a fire suppression assignment to "expand [his] experience and knowledge in fire line operations[.]" D.E. 32-9 at 17. The transfer was approved but never carried out.

Due to a staffing shortage, the MFD often required Mr. Blake and other firefighters on paramedic assignments to work back-to-back 24-hour shifts, in contravention of the MFD's rules and regulations. On September 6, 2018, *The Montgomery Advertiser* published an article reporting on the MFD staffing shortage. The article quoted a high-level City representative, who expressed concern regarding the fatigue public safety personnel (i.e., firefighters and paramedics) would face if required to work double shifts for an extended period.

The City's Employee Handbook encourages employees "experiencing medical/behavioral problems" to consult with an Employee Assistance Program ("EAP") counselor. As described in the Handbook, the EAP provides "treatment resource referrals[ ] and crisis intervention for employees relating to a medical/behavioral problem that may involve psychological or emotional problems [and] . . . some medical conditions (including those related to stress)." Mr. Blake has acknowledged that, while employed by the City, he was both aware of and did not request assistance from the EAP.

The Handbook also contains specific instructions regarding procedures for requesting Family and Medical Leave Act ("FMLA") leave. To request FMLA leave, an employee "must give 30 days' advance notice to their supervisors," or "[i]f the need for leave is unforeseeable . . . employees must inform the department head as soon as they are aware of the need for leave, but no less than five business days from the beginning of their absence, unless an

emergency situation exists . . . in which case the department head must be informed as soon as practicable." In February of 2018, six months prior to the events giving rise to his claims, Mr. Blake followed the City's FMLA leave procedures when he requested and took FMLA leave for carpal tunnel surgery.

## B

On August 21, 2018, Mr. Blake worked a scheduled 24-hour shift. The morning of August 22, 2018, before Mr. Blake finished his assigned shift, District Chief B.S. Hackett, the supervisor for the next shift, informed Mr. Blake that he would be held at the station to work a 24-hour overtime shift. This overtime shift would require Mr. Blake to work a 48-hour shift from 8:00 A.M. on August 21, through 8:00 A.M. on August 23, followed by another already scheduled 48-hour shift from 8:00 A.M. on August 24, through 8:00 A.M. on August 26.

Although Mr. Blake does not recall all that he said to DC Hackett that morning, the parties agree that Mr. Blake told DC Hackett that he "couldn't do it anymore" and that he "would turn [his] stuff in if [he] needed to." D.E. 29-1 at 54:20–23. Mr. Blake did not explicitly say the words quit or resign, but he has since conceded that he referenced turning in his gear because "[w]hen you leave employment, you turn your stuff in." D.E. 29-1 at 82:3–11. In an email to the MFD's Chief of Staff, Mr. Blake further recalled that DC Hackett replied by asking whether he would be willing to write "a letter or put something on paper for him." D.E. 29-4. Mr. Blake declined.

20-14229                Opinion of the Court                5

DC Hackett memorialized his exchange with Mr. Blake in an internal memo addressed to Assistant Fire Chief R. H. Bozeman. In the memo, DC Hackett wrote that he asked Mr. Blake if he intended "to work [two] weeks[,] and [Mr. Blake] replied [']no.[']" D.E. 32-9 at 1. DC Hackett further noted that, following his exchange with Mr. Blake, he received separate calls from two MFD officers who told him that Mr. Blake "ha[d] been severely burned out lately" and that Mr. Blake's "decision" was not permanent. *Id.* DC Hackett further conveyed that he "felt that the Command Staff would have no problem[ ] . . . moving [Mr. Blake] to an assignment that will give him some relief." *Id.* The memo does not, however, reflect that Mr. Blake requested, expressed an intent to, or referred to a need for a leave of absence.[1]

After his conversation with DC Hackett and prior to leaving the station, Mr. Blake, in accordance with MFD's overtime practice, confirmed that the 24-hour overtime shift beginning the morning of August 22 would be covered by another paramedic. Mr. Blake spoke to DC Hackett later that afternoon and told him that he did not mean to be rude or disrespectful earlier that

---

[1] Mr. Blake also submitted three declarations to the district court from fellow MFD firefighters, documenting their recollections of the events of August 22, 2018, and the overall working conditions during the relevant period. *See* D.E. 39-1, 39-3, & 39-4. All three declarations are similar in that they cast Mr. Blake's statements that morning as "informing" DC Hackett that he "could not" or was "not able" to continue working 48-hour shifts as a medic anymore. Although all three reflect that Mr. Blake was "burned out," critically, none of the declarations state that Mr. Blake expressed a desire or intent to take leave.

morning. DC Hackett stated that he did not realize Mr. Blake was "burned out that bad" and reassured Mr. Blake that he was "not past the point of no return." D.E. 29-1 at 62:6 – 63:14.

During this conversation, Mr. Blake did not retract his earlier statements or request leave. Instead, Mr. Blake stated that he would need to speak with his wife and "figure this out." *Id.* at 63:3–10. Mr. Blake, nevertheless, came away from the conversation with the impression that he was welcome to return to work for his next scheduled shift and that "something [would] be worked out." *Id.* at 65:7–9. Specifically, Mr. Blake believed that he would be transferred from his paramedic assignment to a fire suppression unit. Mr. Blake also believed that he would be referred to the EAP for assistance.

After speaking with Mr. Blake, DC Hackett discussed Mr. Blake's situation with AC Bozeman. AC Bozeman instructed DC Hackett not to contact Mr. Blake again because Mr. Blake would not be allowed to return to work for the MFD. The following day, AC Bozeman informed Mr. Blake that the MFD had "accepted [his] verbal resignation" and that he should turn in his gear. *See* D.E. 29-1 at 68:16–21. According to Mr. Blake, he was "surprised" by AC Bozeman's call, but responded "with '10-4 Chief' before [AC Bozeman] ended the conversation." D.E. 29-4 at 2. Mr. Blake spoke to AC Bozeman again later that evening. During that call, AC Bozeman reiterated that Mr. Blake should turn in his gear and advised that he should request a meeting with Fire Chief Milford Jordan. On August 24, 2018, AC Bozeman sent a memorandum to Chief of

20-14229              Opinion of the Court                    7

Operations E.D. Guantt documenting his conversation with Mr. Blake. There, AC Bozeman wrote that the "Montgomery Fire Rescue has accepted [Mr. Blake]'s verbal resignation." D.E. 32-9 at 3.

Believing that "a failure to report to duty would guarantee [his] termination/resignation," Mr. Blake attempted to report to work on the morning of August 24, 2018. *See* D.E. 29-4 at 2. When he arrived at the station, Mr. Blake was instructed not to get on the truck and that he should gather his belongings, turn in his gear, and leave the property. Mr. Blake objected to the removal, responding that he had "broken no rules" and further requesting "something in writing stating that [he] was no longer employed." D.E. 29-3. Mr. Blake was told that he would receive written confirmation, but not before he left the property. As instructed, Mr. Blake gathered his belongings and left the station. The City later documented Mr. Blake's separation in a recommendation for personnel action form dated August 28, 2018, reflecting that Mr. Blake resigned "NOT in good standing." D.E. 32-9 at 12.

Mr. Blake acknowledges that he did not advise anyone in the MFD that he was "experiencing symptoms of PTSD, paramedic burnout [or] sleep deprivation" or seek FMLA leave in connection with the same prior to his exchange with DC Hackett on the morning of August 22, 2018. *See* D.E. 29-1 at 88:3–20. Mr. Blake further concedes that he did not seek medical treatment or schedule any appointments to see a medical professional for any condition related to stress, PTSD, or burnout prior to August 22, 2018. Mr. Blake did, however, begin seeing a licensed counselor some time

after he left employment with the City, but did not submit any evidence of a diagnosis for any condition.

## C

Mr. Blake filed an action against the City in the federal district court in April of 2019. He asserted FMLA interference and retaliation claims.[2]

After the close of discovery, the City moved for summary judgment, arguing that Mr. Blake could not establish facts showing (1) that he was entitled to FMLA leave; (2) that the City knew or should have known that he required leave for an FMLA-qualifying condition; (3) that he was denied any FMLA leave to which he was entitled; (4) that he was constructively discharged; and (5) that he engaged in a statutorily protected activity that could give rise to a FMLA retaliation claim. The district court agreed and granted the City's motion.

## II

We review a district court's order granting summary judgment *de novo*, "viewing all the evidence, and drawing all

---

[2] Mr. Blake also alleged that the City violated his due process rights. Mr. Blake does not raise any argument as to the district court's dismissal of the due process claim, and he has thus abandoned any arguments as to that issue on appeal. *See Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) (finding the law is "well settled in this Circuit that a legal claim . . . that has not been briefed before the court is deemed abandoned and its merits will not be addressed").

reasonable inferences, in favor of the non-moving party." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005). Summary judgment is appropriate only if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See id.*

### III

The FMLA grants an eligible employee the right to take up to 12 weeks of "leave during any 12-month period . . . [b]ecause of a *serious health condition* that makes the employee unable to perform the functions of the position[.]" 29 U.S.C. § 2612(a)(1)(D) (emphasis added). The Act creates a private right of action for equitable relief and money damages against employers who "interfere with, restrain, or deny the exercise of or the attempt to exercise" FMLA rights. 29 U.S.C. §§ 2615(a)(1), 2617(a). There are two types of claims under § 2615(a): "interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." *Strickland v. Water Works & Sewer Bd. of Birmingham*, 329 F.3d 1199, 1206 (11th Cir. 2001) (internal citations omitted).

### A

An FMLA interference claim "has two elements: (1) the employee was entitled to a benefit under the FMLA, and (2) [his] employer denied [him] that benefit." *White v. Beltram Edge Tool*

*Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). As to the first prong, an employee has the right to take FMLA leave only if he suffers from a "serious health condition" that makes him "unable to perform the functions of [his] position." *Id.* (quoting *Hurley v. Kent of Naples, Inc.*, 746 F.3d 1161, 1166 (11th Cir. 2014)).

A "serious health condition" is "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). *See also* 29 C.F.R. § 825.115(a)(1). Continuing treatment by a health care provider includes, among other things, a period of incapacity of "more than three consecutive, full calendar days" and any subsequent treatment or period of incapacity that involves "[t]reatment two or more times, within 30 days of the first day of incapacity, unless extenuating circumstances exist, by a health care provider." 29 C.F.R. § 825.115(a)(1). *See also Russell v. N. Broward Hosp.*, 346 F.3d 1335, 1343 (11th Cir. 2003) ("[I]t takes some fraction more than three whole calendar days in a row to constitute a 'period of incapacity' required" under the FMLA.). "Incapacity" is the "inability to work, attend school or perform other regular daily activities due to [a] serious health condition, treatment therefore, or recovery therefrom." 29 C.F.R. § 825.113(b).

An employee suffering from a serious health condition can state an interference claim only if he gave his employer proper notice of his need for leave. *See White* 789 F.3d at 1195. If it is not possible for the employee to provide advance notice because the

need for leave is unforeseeable, then an employee is required to provide his employer with notice as soon as practicable. *See Cruz v. Publix Super Mkts., Inc.*, 428 F.3d 1379, 1382 (11th Cir. 2005). The notice "must be sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave." *Id.* at 1383 (internal quotation marks omitted). The employee "cannot merely demand leave; he must give the employer a reason to believe that he is entitled to it." *Id.* at 1385. Absent unusual circumstances, an employee must also comply with an employer's "usual and customary notice and procedural requirements for requesting leave." 29 C.F.R. §§ 825.302(d), 825.303(c). Once the employee "gives sufficient notice to [his] employer that potentially FMLA-qualifying leave is needed, the employer must then ascertain whether the employee's absence actually qualifies for FMLA protection." *Cruz*, 428 F.39 at 1383. (holding that the burden to inquire further into the need for leave does not shift to the employer unless and until the employee provides sufficient notice).

Here, the district court did not err in granting summary judgment as to Mr. Blake's interference claim for a number of reasons.

First, Mr. Blake did not show that his burnout symptoms rendered him unable to work for more than three whole days, as required to establish incapacity giving rise to a qualifying condition under the FMLA. *See Russell*, 346 F.3d at 1343; 29 C.F.R. § 2611(12)(B). Nothing in the record suggests that Mr. Blake's

symptoms prevented him from carrying out his duties for more than three consecutive days. Indeed, Mr. Blake acknowledges that he attempted to return to work on August 24, 2018, and was "ready to work mentally and physically"—two days after he told DC Hackett that he would not continue to work consecutive 48-hour shifts for the MFD. *See* D.E. 32-9 at 8.

Second, even if his testimony created a genuine issue of material fact as to whether his symptoms rose to the level of an FMLA-qualifying condition, Mr. Blake did not show that the City had *notice* of a qualifying condition. This is because, as Mr. Blake admits, (1) he never requested leave for any burnout related symptoms prior to August 22, 2018; and (2) his statements to DC Hackett that he "couldn't do it anymore" and that he "would turn [his] stuff in if [he] needed to" conveyed his intent to resign. *See* D.E. 29-1 at 54:20–23; 82:3–11. As to the latter, such bare statements cannot reasonably be said to have apprised the City of the need to take time off for a serious health condition, and therefore, do not amount to legally sufficient notice under the FMLA. *See Cruz*, 428 F.3d at 1385. Mr. Blake, moreover, was clearly aware of the MFD's procedures for providing notice of a need for/requesting FMLA leave, having exercised his right to FMLA leave only six months prior to his exchange with DC Hackett.

On appeal, Mr. Blake argues that the district court erred in ruling that he failed to show that he provided the City with adequate notice of his need to take FMLA leave because it "disregards and overlooks" the significance of (1) the MFD's "longstanding

record of mandating excessive overtime;" and (2) Mr. Blake's "discussions with DC Hackett; the entirety of DC Hackett's Memo to AC Bozeman; DC Hackett's discussions with [Mr.] Blake's superiors; [and] DC Hackett's discussions with members of the MFD's Peer Support Team." Appellant's Br. at 33.

In Mr. Blake's view, the City had sufficient notice of *his* need to take FMLA leave because the MFD was aware that working consecutive 48-hour shifts could cause *any* firefighter assigned to paramedic duty to suffer acute stress, burnout, PTSD, and other physical and mental distress. *See id.* at 38. Mr. Blake also takes issue with the district court's ruling because it does not give due weight to declarations and memoranda documenting discussions that followed his exchange with DC Hackett on the morning of August 22, 2018, even though they do not reflect that Mr. Blake ever expressed an intent, desire, or need to take leave. *Id.*

The FMLA, however, does not require employers to "divine unspoken (and even unthought) requests for [FMLA] leave." *Paasch v. City of Safety Harbor*, 915 F.Supp. 315, 321 (M.D.Fla.1995), *aff'd*, 78 F.3d 600 (11th Cir. 1996). Indeed, even the evidence that Mr. Blake points to suggests that he expected the MFD to transfer him to a non-paramedic assignment or potentially refer him to the EAP—not that he would be placed on leave.

Mr. Blake's argument that the City should have investigated whether his condition qualified for FMLA protection fails for the same reason. The City is required to ascertain whether an employee's absence or requested leave qualifies for FMLA protection

only if an employee has provided sufficient notice that potentially FMLA-qualifying leave is needed. *See Cruz*, 428 F.3d at 1383. The City is not required to ascertain whether an employee who is *not* absent or who has *not* requested leave is entitled to FMLA leave. *See id.*

## B

Absent direct evidence of an employer's retaliatory intent, courts evaluate FMLA retaliation claims under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The employee must first establish a *prima facie* case by showing that (1) he engaged in statutorily protected conduct; (2) he suffered an adverse employment action; and (3) the adverse action was causally related to the protected conduct. *Strickland*, 239 F.3d at 1207.

If the employee establishes a *prima facie* case of retaliation and the employer articulates a "legitimate, nondiscriminatory reason" for the adverse action, the employee must then show that the employer's reasons were pretextual by presenting evidence sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse action. *See Schaaf v. SmithKline Beecham Corp.*, 602 F.3d 1236, 1243-44 (11th Cir. 2010).

Regarding the second *prima facie* element, a constructive discharge can constitute an adverse action. *See Akins v. Fulton Cnty., Ga.*, 420 F.3d 1293, 1301–02 (11th Cir. 2005) (First

Amendment retaliation claim). An employee has been constructively discharged when his employer "imposes working conditions that are so intolerable that a reasonable person in the employee's position would have been compelled to resign." *Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974, 977 (11th Cir. 2003) (internal quotation marks omitted). This may occur where an employer forces the employee's resignation by coercion or duress, or where the employer obtains the resignation by deceiving or misrepresenting a material fact to the employee. *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995).

This standard is higher than the standard for proving a hostile work environment. *See Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001) (quotation marks omitted). Employee resignations, moreover, are presumed to be voluntary. *Hargray*, 57 F.3d at 1568. *See also Venero v. City of Tampa, Fla.*, 830 F. Supp. 1457 (M.D. Fla. 1993), *aff'd*, 40 F.3d 389 (11th Cir. 1994). And "the mere fact that the choice is between comparably unpleasant alternatives . . . does not of itself establish that a resignation was induced by duress or coercion, hence, was involuntary." *Hargray*, 57 F.3d at 1568 (holding that employee's decision to resign was voluntary even where employer threatened he would face criminal charges if he failed to do so).

Here, the district court did not err in granting summary judgment as to Mr. Blake's FMLA retaliation claim. First, Mr. Blake did not offer any direct evidence that the City was motivated by an impermissible or discriminatory animus. Second, Mr. Blake did not

present evidence to show (or permit a jury to find) that he engaged in statutorily protected conduct. As discussed earlier, in his deposition Mr. Blake acknowledged that he never told anyone affiliated with the City about any FMLA-qualifying condition, nor did he request FMLA leave for such a condition before resigning. Mr. Blake also failed to show that his symptoms rose to the level of a qualifying condition under the FMLA, which requires incapacity for more than three whole days. *See Russell,* 346 F.3d at 1343; 29 C.F.R. § 825.115(a).

Importantly, Mr. Blake never asked for nor expressed a need or intent to take leave—he resigned. Once the City accepted his resignation, that terminated its obligations to provide him FMLA benefits. *See* 29 C.F.R. § 825.311(b) ("If an employee gives unequivocal notice of intent not to return to work, the employer's obligations under FMLA to maintain health benefits . . . and to restore the employee cease.").

Third, Mr. Blake has failed to advance any evidence that his resignation was the result of a constructive discharge that could constitute an adverse action. Specifically, there was no evidence that Mr. Blake's resignation was induced by duress, coercion, deception, or misrepresentation of a material fact. Indeed, the evidence demonstrated that Mr. Blake's resignation was motivated by dissatisfaction with his working conditions, which were related to a department-wide paramedic staffing shortage. The mere fact that Mr. Blake faced a choice between comparable unpleasant alternatives (i.e., resignation and a continuing obligation to work

overtime shifts) does not establish that his resignation was involuntary. *See Hargray*, 57 F.3d at 1568.

There is no need to examine whether the City's acceptance of Mr. Blake's resignation was pretextual because Mr. Blake failed to make out a *prima facie* case of retaliation. *See Schaaf*, 602 F.3d at 1243. However, we note that Mr. Blake did not show (or present sufficient evidence to create a jury issue) that the City's reason for terminating him—his resignation—was false, or that the City actually accepted his resignation due to a request for FMLA leave, or any other statutorily protected conduct. As such, Mr. Blake failed to show pretext as well.

## IV

Accordingly, we affirm the district court's grant of summary judgment in favor of the City of Montgomery.

AFFIRMED.